RAYMOND L. NEVALA ET AL., PLAINTIFFS AND APPELLANTS, *v.*
DAVID J. McKAY, DEFENDANT AND RESPONDENT.

No. 14172.
Submitted June 19, 1978.
Decided Aug. 30, 1978.
Rehearing Denied Oct. 2, 1978.
583 P.2d 1065.

Jardine, Stephenson, Blewett & Weaver, Great Falls, Jack L. Lewis (argued), Great Falls, for plaintiffs and appellants.

Smith, Emmons, Baillie & Walsh, Robert J. Emmons (argued), Great Falls, for defendant and respondent.

MR. CHIEF JUSTICE HASWELL delivered the opinion of the Court.

This is an appeal from a summary judgment entered in the District Court, Judith Basin County, Montana. Appellants (lessees) sought an order requiring respondent (lessor) to set a definite sale price for the leased land and enforcement of their claimed right of first refusal under the terms of the lease. The appeal involves a relatively complex set of facts which we detail herein to clarify our conclusion that the judgment of the District Court should be affirmed.

In 1964 Dr. David McKay leased a parcel of land in Judith Basin County, known as the Carl Thisted Ranch, to Raymond and Carrine Nevala. The agreement was executed on a standard Montana Livestock Share Lease form, the pertinent portions of which were the term of the lease and the owner's agreements. The "term" provision was:

"2. TERM: This lease shall be in effect from December 1st, 1964 to 15 days after calves delivered, 1971, and shall, with such written modification as may be agreed to at the beginning of each year, continue from year to year thereafter unless terminated by written notice by either the owner or the tenant to the other at least 6 months before the expiration date of this lease or any extension."

In the owner's agreements, a right of first refusal was set out:

"14. OWNER AGREES:

"* * *

"E. To give tenant written notice of specific intentions to sell the farm and to permit the tenant to have 60 days in which to arrange

purchase of the farm in case he indicates an interest in buying * * * ."

In 1971, after the original term of the lease had expired, and even though the lease would have automatically continued from year to year under the "term" provision quoted above, the parties made a notation on the back of the lease. The notation provided: "Lease is extended to December 1, 1974—except Paddies 80 to be deleted." The notation was dated "10.4.71" and signed by Dr. McKay and Ray Nevala. After the extension created by this notation expired in 1974, and with no notice to terminate ever having been given, the Nevalas stayed on the ranch and continued farming it. A settlement of accounts was made for the year 1975 on the terms provided for in the original lease agreement. Apparently, although it is not specifically stated in the record before us, accountings on those same terms were also made for the years 1976 and 1977. The Nevalas have remained in possession of the ranch at all times after the initiation of this action in 1976 and throughout its various stages, despite being served with notice of termination of their tenancy by McKay on April 19, 1976. Due to this continued possession and the conflicting contentions of the parties concerning their rights in the property, we have advanced this matter on our calendar to expedite this appeal, clarify the status of the title to the land, and prevent any further possible inequity to either party.

The critical events that have culminated in this appeal began on September 26, 1975. On that day, McKay offered to sell the ranch to Nevala for $90 an acre. Nevala told McKay he would have the money or raise financing by the next Monday. However, early that Monday morning McKay telephoned Nevala and told him he was going to keep the ranch. Later that same day, McKay received an offer from third parties for the sale of the Carl Thisted Ranch and two other pieces of property which McKay owned. McKay, in a written instrument, dated September 29, 1975, agreed to sell the three ranches for $1.25 million.

The following day McKay notified Nevala that an agreement

had been reached to sell the property to third parties. Nevala objected that he and his wife were still interested in purchasing the property covered by their lease under their right of first refusal. Whether the terms of the September 29, 1975, agreement were disclosed to Nevalas is in dispute; they contend that McKay told them that $600,000 of the $1.25 million purchase price was allocated to the "Carl Thisted" parcel.

On February 19, 1976, after numerous encounters and discussions had taken place between McKay, the Nevalas, and their respective counsel, McKay and the third parties with whom he had agreed on the three parcel sale, executed a document formally cancelling that agreement. Nonetheless, the Nevalas insisted that McKay had formed the requisite "specific intentions to sell the farm" within the meaning of the original lease provision and that therefore their right of first refusal had become absolute.

A complaint was filed in District Court by the Nevalas on March 18, 1976. The complaint sought an order requiring McKay to specifically perform under paragraph 14E of the lease, as quoted herein, by furnishing the Nevalas with a copy of McKay's agreement of sale with the third parties or by otherwise informing them in writing of the terms and conditions of his intended sale, so that they could determine if they had an interest in purchasing the leased premises for the price allocated to it and under the same terms and conditions. The complaint was later amended, asking the court itself to set a price for and terms of sale of the Carl Thisted Ranch. Both parties subsequently moved for summary judgment. The Nevalas' motion was denied, summary judgment was entered in favor of McKay, and this appeal by the Nevalas followed.

The issue on appeal is whether the District Court erred in granting McKay summary judgment and denying summary judgment to the Nevalas.

The effect to be given a right of first refusal under a lease has been the bone of contention in a vast number of cases. There is significant difference of opinion from jurisdiction to jurisdiction. A large body of law has evolved, discussing the topic in a myriad of

factual settings. See: Annot. 15 A.L.R.3d 470 for a representative sampling. Many of the cases cited as authority by the parties hereto are factually distinguishable and raise peripheral issues not involved in this appeal. We make no attempt to reconcile the split of authorities, but decide this matter in accordance with guidelines established in prior decisions of this Court.

■ The primary issue involved here, as we see it, is whether a right of first refusal carries over into a holdover tenancy. For the reasons discussed below, we hold that it does not. We conclude that the Nevalas were holdover tenants on September 29, 1975, when McKay entered the agreement to sell the leased property to third parties. As holdover tenants, the Nevalas, under the rule established by our decision in *Miller v. Meredith* (1967), 149 Mont. 125, 423 P.2d 595, no longer had a right of first refusal available to them. We affirm the summary judgment in favor of McKay.

■ We reach our conclusion that the Nevalas had become holdover tenants by September, 1975, by an analysis of the intent of the parties as reflected in the terms of their agreement. The tenancy created at the beginning of the lease was a term for years of December 1, 1964, to 15 days after calves were delivered in 1971, to be followed by a tenancy from year to year terminable by either party on six months notice. Under this initial "term" provision, the parties would not have had to do anything further to keep the lease in effect after the term for year. In October 1971, however, they extended the lease by written agreement on the back of the printed form used for the 1964 lease. No reference was made to the tenancy from year to year created by the original lease. The notation simply provided an extension from the expiration of the original term in 1971 to December 1, 1974. The Nevalas argue that the effect of this extension was merely a lengthening of the term of the original lease, with the tenancy from year to year to begin after the expiration of the extended term. This argument might have credence and vitality if the extension had been made pursuant to a particular provision in the 1964 lease. It was not, however, and therefore we conclude that the extension constituted a new agreement entered

into by the parties, creating a new tenancy not contemplated by the original lease. The notation extending the lease was, in effect, a modification of paragraph 2, the "term" provision of the lease. As modified, the "term" provision specified that the term ended on December 1, 1974.. It did not provide for any renewal, extensions, or automatic year-to-year continuation as in the original lease. Therefore, the lease expired on December 1, 1974, and from that point on the Nevalas were holdover tenants.

Having determined that the Nevalas were holdover tenants in September 1975 when they first asserted their claim to a right of first refusal, we hold they had no right of first refusal.

We recognize that a few jurisdictions have allowed holdover tenants to exercise an option to purchase or right of first refusal during the holdover period, but by far the greater weight of authority is that such option or right cannot be exercised by a lessee holding over after the expiration of the lease. Anno. 15 A.L.R.3d 470, § 7.

One of the grounds often advanced for a decision that a purchase option may not be exercised during a holdover period is articulated as follows:

"* * * [The option] is a covenant which is separate from and independent of the lease, and, not being one of the terms of tenancy, is not extended into the holdover period and cannot be exercised during such period." 15 A.L.R.3d at 494. It was this rationale that we adopted in arriving at our decision in *Miller v. Meredith*, supra, the case we hold controlling here. In *Miller*, the lease provided: "It is further agreed that Raymond Miller shall have the right of option should the lands be for sale." The question before the Court was whether a tenant holding over can exercise such an option. We held that an option to purchase does not carry over into a holdover tenancy because the lease and the option are distinct agreements. *Miller*, 149 Mont. at 129, 423 P.2d at 596. We apply the same reasoning here.

We recognize that *Miller* did not discuss the effect of section 42-205, R.C.M.1947, which provides:

"If a lessee of real property remains in possession thereof after the expiration of the hiring, and the lessor accepts a rent from him, the parties are presumed to have renewed the hiring on the same terms and for the same time, not exceeding one month, when the rent is payable monthly, nor in any case one year."

The Nevalas argue that because this statute presumes a renewal upon the same terms, the right of first refusal is also carried forward. *Miller*, however, did refer to section 93-9703, R.C.M.1947, dealing specifically with cases of holdover tenancy on agricultural lands. This section contains language substantially the same as that in section 42-205 (the holdover tenant is "entitled to hold under the terms of the lease", section 93-9703(2), R.C.M.1947), yet we concluded that the option expired with the lease. In citing section 42-205, R.C.M.1947, the Nevalas urge us to adopt a construction that would require that every provision of an expired lease is extended into a holdover period. *Miller* clearly establishes that there is no such rule of law in Montana. Our decision in *Miller* and its application to the circumstances in this appeal, are supported by numerous decisions from other jurisdictions. Cf. *Butz v. Butz* (1973), 13 Ill.App.3d 341, 299 N.E.2d 782; *Glockine v. Malleck* (1963), 372 Mich. 115, 125 N.W.2d 298; *Wright v. Barclay* (1949), 151 Neb. 94, 36 N.W. 645; *Andreula v. Slovak Gymnastic Union Sokol Assembly* (1947), 140 N.J.Eq. 171, 53 A.2d 191.

We should point out that a significant portion of the argument in appellants' brief was devoted to citation of authority in support of the proposition that when a lease is extended or renewed pursuant to a provision in the original lease agreement, an option exercisable during the term of the lease to purchase the leased premises is likewise extended. 51C C.J.S. Landlord and Tenant § 71; 50 Am.Jur.2d, Landlord and Tenant § 1159. We do not dispute the correctness of this rule. We find it inapplicable here because of our conclusion that the notation made by the parties on the back of the lease in October 1971 constituted a modification of the "term" provision of the original lease. As modified, the term provision did not provide for extension or renewal. Thus, after December 1,

1974, there never was any "extension or renewal pursuant to a provision therefor in the original lease agreement" within the meaning of the authorities cited. Since the Nevalas attempted to assert the right of first refusal when the modified "term" had expired and they had become holdover tenants, their reliance on the above-mentioned authority is misplaced.

The judgment of the District Court is affirmed.

MR. JUSTICES DALY, HARRISON and SHEEHY concur.

MR. JUSTICE SHEA, dissenting:

I would reverse the summary judgment and send this case back for trial. In reaching their decision, the majority has concluded as a matter of law that the words "Lease is extended to December 1, 1974 . . ." mean that only the term portion of the lease was extended and the year-to-year tenancy provision was not also extended. I cannot accept their reasoning that the *lease* was unconditionally terminated on December 1, 1974. It has effectively precluded the Nevala family from presenting evidence on an issue vital to their future as a ranching family. They have been foreclosed from asserting any right to purchase land on which they have worked for many years.

The original lease contained a provision which allowed a year-to-year tenancy at the expiration of the specific term of years provided for in the lease. The first lease was in effect from December 1, 1964 until 15 days after the calves were delivered in 1971. There is no direct evidence as to when the calves were delivered in 1971, but presumably they were delivered in the spring of 1971. From that time on, under the first lease, the Nevala family was holding under the year-to-year provisions of the lease. But in the same year, October 4, 1971, David McKay and the Nevala family again signed the original lease (which contained the provisions for a year-to-year tenancy) by stating the "Lease is extended to December 1, 1974 . . ." The parties specified the term of years as being from October 4, 1971 to December 1, 1974.

By the terms of the extension, the tenancy for years terminated

on December 1, 1974. At this point however, the Nevala family was not holdover tenants as the majority has concluded. Rather, they were then holding the land as year-to-year tenants under the provisions of the 1964 lease which was signed again on October 4, 1971. The parties moreover, clearly regarded themselves as being in a valid landlord tenant relationship, and even the majority has recognized this.

Pursuant to the original lease agreement calling for an accounting, the parties settled their accounts in 1975 and it also appears they did so in 1976 and 1977. This conduct, together with their conduct relating to the right of first purchase held by the Nevala family, demonstrates the parties considered themselves to be in a valid landlord-tenant relationship and the Nevala family had a valid and enforceable right of first purchase.

On Friday, September 26, 1975 (while the Nevala family was only holdover tenants, according to the majority), David J. McKay offered to sell the Carl Thisted Ranch at $90 per acre to the Nevala family. The Nevalas agreed to make the financial arrangements by the next Monday. However, on Monday morning, September 29, 1977, McKay called Raymond Nevala and told him the deal was off and that he was keeping the ranch. McKay's desire to keep the ranch however, was only short lived. The same day he entered into a package deal with a team of real estate speculators and signed an agreement to sell the ranch involved here and two other ranches for $1.2 million. The sequence of these events suggests the appearance of a better deal cost the Nevala family their option to purchase.

During oral argument counsel for McKay was asked why McKay made the offer to sell to the Nevalas on Friday, September 26, 1977, if he did not consider the Nevalas had the right of first refusal. The answer was that David McKay is such a "nice guy". He may indeed be a "nice guy", but I am not convinced this character attribute is what impelled him to offer the ranch to the Nevala family. In any event, it appears this character attribute suddenly evaporated over the weekend, for the following Monday morning

he called the Nevalas to tell them the deal was off, only to turn around and make an agreement to sell to real estate speculators.

It is clear the lease extension language interpreted by the majority, is subject also to a contrary interpretation that is just as reasonable, and perhaps more just. In any event the Nevala family should have been given the opportunity, along with David McKay, to testify to what the language means. Accordingly, the summary judgment should be reversed.